Good morning. Happy birthday, Judge Pregerson. I'd like to make three points today. First, the District Court committed fundamental error in excluding Dr. Storchio's testimony by failing to give the appropriate weight that this Court has repeatedly said is the most important weight to be given under Daubert. In fact, giving no weight at all to the independent pre-litigation research Dr. Storchio performed and the peer-reviewed literature. The District Court confused his role as gatekeeper with the role of the jury on matters going to weight and not admissibility. These are fatal errors and this Court should reverse and order Dr. Storchio's testimony admitted. Second, the District Court correctly held that the economic loss rule does not apply in this case because the city stands in no commercial relationship with SQM and independently there has been injury to property other than the defective product. And third, the trial judge also properly ruled that denying the motion for summary judgment on statute of limitations ground applied to proper standard and there was ample evidence in the record to support the conclusion that the city was not appreciably harmed until the state adopted the maximum contaminant level for perchlorate in 2007. Turning to the first point, this Court has made clear that pre-litigation work by an expert is the most persuasive basis for concluding that opinions were derived by the scientific method. Pre-litigation work provides this Court instructed in Daubert II important objective proof that the work comports with good science. This is because there is less likely to be any bias in the work and independent research carries its own indicia of reliability, the Court said, and there are likely to be fewer scientists who are going to be high as guns if you're dealing with people who have performed pre-litigation research. Here, Dr. Storchio both performed pre-litigation research and work in developing the method that was used and he applied it independently in a Chino Basin water quality study that was paid for by the Chino Basin Water Master. If SQM wanted to try to replicate Dr. Storchio's tests, and I understand from the record that I think they didn't try, but if they wanted to try, where could they have done that? I understand from the record that the only commercial laboratory is Dr. Storchio's. I saw from the record that certain government laboratories also do this type of research, the U.S. Geological Survey, Oak Ridge National Laboratory, and Dr. Storchio's lab at the University of Illinois. Would those have been available to SQM if they wanted to take their own samples, follow the protocols in the manual, and try to see what results they came up with? Your Honor, the testimony was that any laboratory capable of doing isotopic analysis, of which there are hundreds, could follow the protocol, take a sample of water, and come up with data that could then be compared to the peer-reviewed reference literature. So it was absolutely available either in any of the labs that helped develop the method, but one of the purposes of the method is to make it available to other isotopic labs, and the record shows that there are hundreds of them. Now, this speaks to an issue of testability, and the evidence was, I mean, this is not some subjective ifsy-dixit approach. This is the analysis of data using well-established technology that's been around since 1947 and comparing it to peer-reviewed reference literature. But the peer-reviewed literature... When you say that it's been around since 1947, are you referring to radioisotopic analysis that I understand has some uses in cancer treatment? I'm referring to gas chromatography. Gas chromatography. So you're saying anybody who has a gas chromatograph can do this kind of analysis? I believe so, yes. Well, how would they compare the results to known samples of perchlorate from around the world? Those are published. Those are published in the reference database. So what the lab does is it takes the water sample, it runs it through the resin, which is part of the methodology, to isolate it. You then run it through the isotopic analysis and the gas chromatograph. You get your output, and that shows you the range of isotopes that are present. You then compare that range to the reference database, which involves hundreds of source sites. So I guess if I understand your answer correctly, you don't have to have your own library of samples. You can basically look to the publications and see what the printout looks like for a particular type of sample. That's exactly right. And there was nothing to prevent SQM, under discovery, from having access to the wells, taking its own samples, or even using water left over. What about the problem of not having split samples? There's no way that they can retest what Dr. Sturcio tested, because he didn't take split samples. He did take split samples, and actually the testimony was that if SQM had ever asked for it, using leftover water that he had would have been another source of testing. So he still has water samples that they could test at this late date? I don't know that for sure, but they certainly could have done it at the time. Because I thought the argument was that they couldn't replicate it, because whatever it was that he tested is long since gone. Your Honor, there are two issues here. One is whether the method has been tested. Right. The validity of the method itself. Right. And the second is whether these particular samples were run according to the methodology, where Dr. Sturcio testified that he didn't need dual samples for his own conclusion. I understand that, but isn't the defendant's argument we can't retest those samples because he didn't do split samples? But the issue isn't, Your Honor, with respect. The issue isn't those samples. Let's get an answer yes or no. Do I understand the position of the defendants? Is that their argument? And then you can tell me, after you answer yes or no, why that position is insupportable. I believe that their position is that they could not retest those samples. Because he didn't take split samples. But he had enough water, and it was leftover, and they could have done it. And then in addition, and this is the key point. So he does have? I see. He does have water leftover from water that he tested is what you're saying. Right. Okay. All right. Whether that's a split sample or not, I don't know. I'm not a scientist. Right. But in addition, if what the court was talking about was the discovery obligation, then that's an opportunity they never availed themselves of. And that is standard in water contamination cases. In which lab would they have gone to replicate or to try and retest what he tested? They can go to any commercial isotope lab of which there are hundreds. So you're saying they could also take their own water samples, or they could have asked in discovery for a portion of Dr. Storcio's samples. They'd go to any one of hundreds of labs. Then they would compare the results to publicly available reference databases. And either their results would agree or disagree with Dr. Storcio's. And then you could say, and your position is, then they present that to the jury. Do I understand that? Right. One caveat. The issue here is the water in the city of Pomona's wells. And I don't believe they could have sampled those without, in the discovery process, without it happening under access to the property. Sure. But they would have asked for a request. They would have filed a request for inspection. And they never did that. So they didn't avail. That was their choice. There's billions of gallons of chloricontaminated water here available for testing. Why was Dr. Storcio excluded in the Medrick case? It was a different compound, a different methodology. That methodology was never peer-reviewed. The sampling technique was challenged in that case. Here, in contrast, SQM's expert agreed that the sampling method was well-established. And isotopes in that case were not measured on a compound-specific basis. So this is a different animal with a much higher degree of scientific rigor attached to it. There is not a case that we've been able to find where there was independent peer-reviewed, independent pre-litigation research, peer-reviewed literature which is unanimous in supporting the methodology. Is there any peer-reviewed literature that he hasn't had a hand in writing? I saw an impressive list of publications, but he seems to be a co-author or an author of every one of them. He is not the lead author on many, on several of them. So the answer is that no one independent of Dr. Storcio and his two colleagues from DOE and USGS has published in this field? I think that's correct. But they have been published in preeminent journals, and the essence of and the importance of peer review is to determine whether there is a debate within the peer-reviewed literature. Well, so far it doesn't sound like there's any debate. There isn't. That's my point. Right. But nobody's challenged him, I guess is what I'm asking. Nobody has ever challenged an attribution of source under this methodology, which speaks to in part the error rate because SQM asserts that there is an unacceptable or unknown error rate. There's not been any showing that there has ever been a single misidentification of source. So what about the argument, and I have to say that science is hard to follow for we non-scientists, but what about the argument that he discarded certain results as outliers and therefore his results are not as error-free as he insists that they are? This is an issue with respect to his testing in this case. Right. And it's disputed. He provided an explanation in his report and in his declaration and in his testimony. So your position is the jury is going to have to sort that out? Right. Okay. Right. I do want to make sure that I at least address the two other issues, if I may, unless there are more questions. Do you want to save some time? Well, I have, I believe, almost three minutes before the three minutes I reserved. No. You have two minutes and 44 seconds left of the total time allotted to you. Let me then step very quickly to the statute of limitations issue. The trial court got this one right. The test that he applied is the same one that was recently adopted by the Second Circuit in the In Re MTBE New York City case. A reasonable water provider standard strikes the proper balance between regulatory requirements and a water provider's interest. None of the issues or documents on which SQM relies for its proposition that the city suffered appreciable injury before the statute of limitations period is inconsistent with the testimony of the witnesses that all earlier actions were nitrate-focused, that they were not designed or operated for perchlorate control, they involved no extra cost, and that any benefit of nitrate, I'm sorry, perchlorate removal was ancillary to the statute. Those are disputed issues of fact. Thank you very much. Thank you. Thank you. Thank you. Good morning, Your Honors. I'm honored to represent the appellee and cross-appellant SQM North America in this matter. My name is Michael Johnson. I'd like to reserve about two minutes to address on servo bottom, if I may, any cross-appeal issues, if procedurally that would be appropriate. Or I can address all the issues now. We are cross-appellant, and I thought we would go in that order. Go ahead. Okay. Thank you. The person who has the most to gain if this method is adopted by the Court is Stercio himself. He's the sole spokesperson for the method. All of the papers were written by him. He's the only person that submitted any evidence in this Court in support of the method. I mean, so what? I mean, that's a jury argument, isn't it? It goes to independence. It actually goes very closely to his independence. He's not an independent scientist. He's an advocate for his client in this case. It's also important because Pomona has no direct evidence that SQM 5 was ever used in Pomona, so its entire case turns on Dr. Stercio. They acknowledge this. That's why they dismissed their case when the interventional ruling came down. So I guess I'm concerned, though, nobody's taken him on in the scientific world. These articles have been out there for, what, at least ten years? And nobody seems to have engaged in any kind of a debate on the legitimacy of the methodology. Well, I think there's an easy answer for that. The articles are abbreviated versions of the method. The articles are substantially qualified, as we pointed out in the briefs and in the record. And the full method was admittedly only presented when the final version of version one of the DoD manual was issued in December of 2010, literally days before trial in this matter was supposed to commence. Since December 2010, have there been any peer-reviewed articles criticizing or attacking Dr. Stercio's methodology? I don't know the answer to that question. They're not in the record. Certainly there's none in the record supporting him either. Well, you hired your experts, right, who basically want to say that this is junk science, but they should know if anybody's engaged him in scientific debate on the legitimacy of the methodology. And they're not telling you? They're telling you there's nobody out there that's challenging this man? There's resounding silence, both in favor of the method or opposing it, which is why it's important that he's the only spokesperson for the method. He's got the most to gain, and he's the sole spokesperson. What about his two co-authors, two colleagues that have also written articles, peer-reviewed articles with him? So he's not really the sole source. He's one of three, right? He's part of a group that is funded by the Department of Defense. That's all in the record and very well established. If you look at Dr. Stercio's CV, you'll see that he's been paid over $660,000 by the Department of Defense to develop this method since 2005. And your position is they have the same problem that the city does, or actually that you do, that they're being accused through their various Cold War operations of polluting groundwater near military installations and labs. Correct. The Department of Defense acknowledges that the purpose of the study is to try to limit its liability by finding another deep pocket to blame for perchloric contamination. Sounds like a good impeachment argument to me, but I don't — I disagree, Your Honor, and we disagree. That goes to independence. Independence is a factor that should be considered, and Stercio is not independent. What about the fact that EPA, at least in Region 6, is using this methodology in order to track down polluters of groundwater? There's no evidence of that in the record. I thought I read that somewhere. I didn't make it up. The only evidence in the record on that is Stercio's own statement that he has been hired by EPA, Region 6. He doesn't explain what it was for. There's no evidence that it was for use in court. It could have been screening methodology. They could have been looking at it for their own interest. I guess the concern I have is the one that Judge Simon just articulated. If he's the only one in the world who's doing this, but all these government agencies and government scientists are banding together with him and hiring him, why doesn't that pass the gatekeeping function under Daubert so that you can raise all these objections to the soundness of his methodology and the bases of his opinions, but the district court can't conclude on this record that it's junk science if they don't have anybody there to tell them it's junk science, and why? Well, I mean, a couple answers to that. First of all, Daubert is a multi-factor test, and that's very clear. Pomona's reliance on Daubert II is mistaken. It's a misread of the case, and it's contrary to Supreme Court precedent and many other cases that say all of the factors in Daubert have to be considered, especially when you're talking about a new scientific method. And the trial court here did consider all of the factors. Are you considering this, the Ninth Circuit's decision a few months ago in Alaska Rent-A-Car, where the Ninth Circuit said that the role of the district judge in a Daubert motion is, quote, to screen the jury from unreliable nonsense opinions, but not exclude those that are merely impeachable? Well, I'm aware of that case, Your Honor, and I think there's certainly a big gray area between nonsense and merely impeachable. This is why the district judge is vested with discretion. The district judge is the most knowledgeable about the case. The district judge reviews the record. The district judge here reviewed the record, had the opportunity to observe Dr. He asked his own questions. He put his finger in some of those questions, right on the major flaws with the method. What's the relevance of the fact that the district judge could observe Dr. How is that relevant to this argument? It's relevant because it gives him the opportunity to see the witness testify and to ask questions that are important on the Daubert factors that the parties may not have raised. For example, the district judge in this case put his finger on two of the very significant problems with regard to error rate, which are that the reference database has a very limited number of samples in it, three locations in the entire world, and also on the fact that there's no theory, there's no scientific theory to support the underlying hypothesis of this method, which is that isotope signatures vary from location to location. That's one of the premises of the method. There's no scientific theory, and the judge asked him about that. He asked him, why do they, why do the signatures vary from location to location? And Dr. Sturgeon said, we just don't know. I've read both sides' arguments on that in the transcript, but I was picking up on your statement that the trial judge had the opportunity to observe him, and I'm concerned that there may be weighing of credibility here, and that's, I don't think, is the judge's role in a Daubert hearing. I didn't mean to imply that the decision was based in any way on a weighing of credibility, which might have been a jury issue. The trial judge observed, the trial judge carefully considered all four Daubert factors, testing and testability. The method has not been tested or independently validated by any other laboratory. We know that because the DOE went up. Have you asked another laboratory to see if they can replicate the methodology here? They can't. Cannot. They cannot. They just can't do it? Because they are not set up to run the Chlorine 37 test. The Chlorine 37 is one of the isotopes that's measured. Only Dr. Sturgeon does that. So plant. This is in the record to the Chlorine 37, and then the oxygen isotopes. USGS and Reston do not do the Chlorine 37. Could you go into a little more depth on this? Because I asked this question to a plaintiff of Helland's counsel, and the response I heard was that hundreds of laboratories around the country could do this. You take some of the water sample that you obtained through a request for inspection, and then they could isolate through their resin testing, and then they could isolate the isotopes and compare that to a reference database. Are you saying that Plaintiff of Helland's counsel's response is just flat-out wrong? And if so, can you point something in the record to me that will show that? Yes, the response is flat-out wrong for a couple reasons, and Dr. Aravena's declaration goes into that. It's flat-out wrong because the labs are not set up. Other labs are not set up to run the Chlorine 37. This is disclosed in the FOIA request that we sent to USGS, where they explained that only the University of Illinois runs the Chlorine 37. It also goes to the fact that there are no calibration samples. Now, these are the reference. There's the database, okay, and then you've got the calibration samples, which are used to calibrate the equipment. Those calibration samples are provisional. We asked USGS FOIA requests, and this is attached to my declaration. It's in the SCR. We asked for documentation regarding those reference samples, the calibration samples, and it came back that they don't have anything. They're in the early stages of preparing a paper with regard to those provisional calibration samples, and they didn't expect that to be ready until sometime in 2012, okay, two years after we sent this, after we sent the request. Have they supplemented their discovery request? No, we've been on appeal. The record's been silent on that. So there's no way to calibrate the equipment is what I understand your answer. Yeah, the DOD manual says that the calibration samples are provisional and therefore all results are interrupted. So it's not enough to just have a laboratory that has a gas chromatograph. That doesn't mean that they're capable of replicating what Dr. Sturczyk was doing. Right, and remember, the method is not just that part. The method starts with sampling the groundwater through the resin and then obtaining the chemicals out of the resin, right, and then purifying them and then running the gas chromatograph or the mass spectrometer on me. Can't anyone or any lab do that? No, no one else does it. If you remember, this method was not published until days before trial. I mean, how are we supposed to do that at trial? Okay, so when I say the method's not been validated, the manual admits that it's never been validated or independently tested. And this is crucial because the heart of science is interlaboratory validation. EPA recommends that at least three labs participate in interlaboratory validation. And you're saying there aren't three labs that can do it? There's only one. I'm saying there aren't three labs. It happens to be Dr. Sturczyk. First of all, there aren't three labs that can do it and there aren't three labs that have done it. There's only one. There's only one. That's what the DOD manual says. There's only one. Now, Dr. Sturczyk and his attorneys know better, okay. They got burned in MedDRAC, and now they're back with the same science, the same problems with regard to testing and testability, the same problems with regard to no error rate, the same problems with regard to no peer-reviewed literature, the same problems with no general acceptance. You would think, given what's riding on the case, that they would have taken, for example, a dual column, sent the dual column to one of these hundreds of laboratories, right, that can do this, supposedly, and asked them, run the numbers and let's see if you get the same numbers that Dr. Sturczyk does. Well, they didn't. There's a reason they didn't do that because no other lab can do that. Moreover, they're concerned that the method itself is labor-intensive and somewhat variable, their own words, and they're going to get back some results that are going to cause them some problems. So if there's any further questions, I'm happy to answer them. You know, this method, the trial court did not abuse its discretion. It considered all of the factors. Its findings were supported in the record as to every factor, and its decision is not implausible or illogical, and so that should be affirmed. With regard to the statute of limitations, I've got a minute and a half left. Our position is fairly clear. The undisputed evidence in the record shows that Pomona incurred tens of thousands of dollars in testing expense. They incurred over $200,000 for a perchlorate and nitrate and other chemical treatment plant at Well 19. They incurred over $880,000 with regard to a treatment plant at Well 37. Are those the wells that are still in issue after the amended pretrial disclosures? I'm drawing a blank on which are the wells that are still at issue. These are not part of the AEP wells. But Well 37 was in their initial damage disclosure. They were claiming that as damages. But now they're not. You can't just parse your damages like that to avoid the statute of limitations. That's not appropriate. Under California law, the statute of limitations begins to run as soon as you have any damages, even if they're nominal and even if they're uncertain in terms of the total amount. Well, in the MTBE case out of the Southern District of New York from 2006, applying California law, didn't the district court in New York say that, yes, you can parse it basically site by site or well by well? That's a very different fact. It's not California law. It's not. We don't have a site by site. The MTBE case was hundreds of sites. We have one site here. And that's New York law. It's a district court decision interpreting New York law. Although I thought in the decision that I'm looking at from December 14th, 2006, they're applying California statutes of limitations. I'm sorry. You're correct, Your Honor. Thank you. It's California law. But I would suggest that the case that's more on point is the Ninth Circuit's recent decision in Chubb, which we sent to the Court about a week and a half ago. Right. But Chubb dealt basically with subrogation issues, not appreciable in actual harm, right? No, no. It's exactly the same because the carrier was subrogated to the insured's rights and therefore it's standing in the shoes of the insured, which was pursuing those claims. And the Chubb case adopted the California statute of limitations law as we interpreted in this case. So, and not only that, just one more point. The Well 37, the AEP wells are what they tried to carve out for their damages claim. In their permit application in 2001 to the California Department of Health Services, Pomona represented that it was in fact providing treatment for the AEP wells using its AEP treatment system for perchloric, specifically for perchloric. So the declarations, you know, given all of the evidence, given the testing and the expense and the AEP treatment that was being provided, it's very clear that these declarations where they basically say, well, we put our head in the sand until the MCL came out, those are sham declarations and should be disregarded. There's no tribal issue of fact with regard to the extent to the damages that were incurred by the city. Thank you. If you look at Dr. Storchio's declaration in this case, starting at ER 357, he takes on directly this issue of whether another lab could handle this kind of analysis. He says, the motion states that, quote, a litigant has no ability to run a sample elsewhere to compare the results. This statement belies the fact that a complete disclosure of our standard operating procedures for sampling, extraction, purification, and isotopic analysis of perchlorate are provided in my expert report of October 12th, 2011, and in the ESTCP guidance document, which is cited in the motion. This information could be given to any competent isotope laboratory and used to confirm the validity of our results, unquote. He then goes on, on page ER 358, to discuss the calibration issue that he has, and to describe how, in fact, one can go ahead and do it if you have the proper reference materials. So there's nothing to that argument. I take it Dr. Storchio didn't send some of the samples to an independent lab to see if they could confirm the results. Am I correct? No. That is, yes, you're correct, but he would have had no reason to do that. Other than to validate the validity of his methodology. And that it could be validated. Except that it hasn't been called into question by anybody except a retained litigation expert for the defendant here. And with respect to the error rate, the Mitchell case makes clear that where there has not been a demonstration of errors, it's the defendant's burden to come forward and show that there have been misidentifications or that there likely can be. You can't just say, well, it might be perchlorate from the top of Mount Everest, when, in fact, there has never been a misidentified source.  Again, the documents are consistent with the witness's testimony that what was going on was that the city was treating for nitrate, which was in violation of an MCL. They were aware of perchlorate, and they knew that the process for treating nitrate would have the ancillary benefit of removing some of the perchlorate. But until they had the MCL, they didn't know what they needed to do. And you can understand this, because once the MCL was in place, they changed operations. It became so expensive at the AEP wells that they have had to build a new perchlorate treatment facility, the cost of which is the basis for much of the damages claimed now. The empty. Am I out of time? Well, the other side went over. Well, I want to go back to the notion on Dr. Storchio that somehow we were misreading Daubert too. The quotes, the language that I used in my opening came from that case. And if you look at Daubert too discussing pre-litigation research and peer review, the point of peer review is to see if the method has been challenged. And it wasn't here. It's therefore generally accepted by the scientific community. And all of the other quibbles which are highly disputed by Dr. Storchio are matters for the jury. Can we conclude that the scientific community has accepted it, or can we only say it hasn't been challenged? The threshold for general acceptability is that some portion that is not minimal of the scientific community accepts the approach. I think the thing we can say for sure is that there are three scientists who accept it, Dr. Storchio and his two colleagues. No, we can go much beyond that, Your Honor. There is the Department of Defense manual. Written by Dr. Storchio and his colleagues. Well, he participated in that. There was Dr. Urbanski from EPA who testified that it was a robust and reliable methodology. And as Dr. Storchio explained, his articles have been published in eminent top flight journals. Where have they been published? Proceedings of the American Chemical Society. And I apologize. I don't have the list at my fingertips. We've got it in the right. No further questions. We're going to take a brief recess.
judges: Simon, Pregerson, Tallman